**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TIARA WILLIAMS,

              Plaintiff,

v.

MASTRONARDI PRODUCE-USA, INC.,

              Defendant.

_____/

Case No. 2:23-cv-13313

Hon. Brandy R. McMillion
United States District Judge

## <u>OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 40)</u>

Plaintiff Tiara Williams ("Williams") initiated this employment action against her former employer, Mastronardi Produce-USA, Inc. ("Mastronardi"), for claims of harassment, discrimination, retaliation, and hostile work environment pursuant to 42 U.S.C. § 1981, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Michigan Elliott-Larsen Civil Rights Act, MICH. COMP. LAWS § 37.2101 *et seq.* ("ELCRA"). Before the Court is Mastronardi's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(a). *See* ECF No. 40. The Motion has been fully briefed, such that the Court can rule based on the record before it in lieu of holding a hearing. *See* ECF Nos. 40, 42, 47; E.D. Mich. L.R. 7.1(f)(2). For the reasons stated below, Mastronardi's Motion is **GRANTED IN PART** and **DENIED IN PART**.

1

## I.

Williams began working for Mastronardi in May 2023 as a Grader in the produce department at the company's facility in Livonia, Michigan.  ECF No. 40, PageID.459.  Mastronardi is a distributor of fruit and vegetables marketed and sold throughout the United States.[1]  *Id.*; ECF No. 40-4, PageID.642.  As a Grader, Williams was responsible for sorting incoming produce, specifically tomatoes and peppers, to fulfill orders according to client specifications.  *See* ECF No. 40-4, PageID.638.  Her sister, Diamond Williams ("Diamond") was her Supervisor, and Johnny Galarza ("Galarza") and Rick Patino ("Patino") were her Shift Managers.  *See* ECF No. 40, PageID.460.  Wesley Phillips ("Phillips") was the Senior Production Manager overseeing Galarza, Patino, and Diamond.  *Id.*  According to Williams, she also was instructed on her job responsibilities by Phillips, Jeff Emberton ("Emberton"), Chris Felosak ("Felosak"), and for a brief period reported to a supervisor named "DJ."  ECF No. 40-3, PageID.509-510.

### A.    Williams' and Phillips' Relationship

Prior to Williams' employment at Mastronardi, she communicated with Phillips on a personal level.  *See* ECF No. 40-7.  Both Phillips and Williams represented that they were acquainted with one another and their interactions dated

---

[1] Mastronardi also has a Canadian arm (Mastronardi Produce Limited), which was incorrectly named in the original Complaint, but dismissed by agreement of the parties when Plaintiff filed her Amended Complaint.  *See* ECF Nos. 1, 22.

back to 2022. *See* ECF No. 40-3, PageID.513; ECF No. 40-5, PageID.741. Williams' sister Diamond connected the two, when Diamond worked at Mastronardi with Williams. *Id.* Both before and after Williams began working at Mastronardi, she and Phillips exchanged many personal text messages and photos. *See* ECF No. 40-6; ECF No. 40-7; ECF No. 43-1. Williams alleges that Phillips assisted her with obtaining employment after encouraging her to apply. ECF No. 40-3, PageID.600; *see also* ECF No. 40-7, PageID.852 (text message from Williams to Phillips stating "Hey can you pull my app").

Williams offers a detailed list of some of the messages exchanged between the two parties while she was employed at Mastronardi and Phillips was her Senior Manager. *See* ECF No. 42, PageID.1268.[2] Williams alleges Phillips made sexual advances toward her; however, when she rebuffed those advances, he responded negatively with text messages of various characters throwing and destroying things

---

[2] As summarized by Williams, these messages included (a) text asking Williams "Wassup wit you. Why you so mean" with Plaintiff responding with a confused emoji; (b) text asking Williams if Phillips could post a picture of her on Facebook so he could "show these hoes what a bad b*tch looks like" which included a kissing face emoji; (c) text between Phillips and Diamond about Williams stating "She don't mess with me frfr," and "She mean and she act like she don't like me," "I really wanna talk to her," and "She just pissed me off." His last text said "I'm done" with a photo of Jack Nicholson's character (who tried to kill his wife and son) from the movie The Shining; (d) Phillips sent Williams a meme of himself with a woman's voice stating "cause who the f*** is he and why the f*** he ain't in my draws yet?"; (e) Phillips sent Williams a video of Billy at the gym, and after Williams did not respond, followed up with an explicit song after Phillips told Billy not to talk to her because Williams was Phillips boyfriend; (f) text to Williams with a "meme" of a rhinoceros defecating that said "YOU ARE FULL OF S***"; (g) text to Williams of various characters throwing and destroying things after Williams rebuffed Phillips' advances. ECF No. 42, PageID.1268-1269 (citing ECF No. 43-1, and Williams Dep, found at ECF No. 40-3).

and an image of Jack Nicholson's character from the movie, The Shining, in which that character tried to kill his wife and son.  ECF No. 42, PageID.1268.  Williams claims that the text messages were harassing.  ECF No. 40-3, PageID.579.

In addition to the text exchanges, Williams also alleges that when she rebuffed Phillips' advances, he would physically throw things in the plant.  ECF No. 40-3, PageID.525, 584.  She states that Phillips would refer to her as his "girlfriend" to other employees, including co-worker Billy Peterson ("Peterson").  ECF No. 40-3, PageID.601, 607.  However, Peterson denied any knowledge of their relationship.  ECF No. 47-2, PageID.1435.  Phillips does however admit that he was interested in Williams in a romantic way.  ECF No. 40-5, PageID.748.

Williams also alleges that there were several requests made by Phillips, to which she complied, out of feared retaliation.  *See* ECF No. 42, PageID.1277; *see also* ECF No. 40-3, PageID.523-524.  For example, Phillips would ask Williams to go and get him food while she was at work on the clock.  *See* ECF No. 40-3, PageID.535-536.  He would ask her to take him and pick him up from the gym to take him home. *Id.* at PageID.523.  At his request, she took him to run errands at an auto parts store. *Id.*  Phillips denies that he ever asked Williams to leave work to get him food or pick him up from the gym but admits that she has taken him home from work.  ECF No. 10-5, PageID.748.

4

Williams claims to have reported her interactions with Phillips to Human Resource Generalist Kara Yeager ("Yeager"), and her various supervisors—Patino, Diamond, and "DJ". *See* ECF No. 40-3, PageID.525-526, 589-590. She states that her sister Diamond feared for her own job if she reported what she knew about the interactions with Phillips. *Id.* at PageID.526. Yeager denies ever receiving complaints about Phillips. ECF No. 47-3. She states that when she met with Williams, it was together with Phillips and Senior Human Resource Manager Margherita Marini ("Marini"), and that Phillips would not have been permitted to be in the meeting if there were claims against Phillips. *Id.* Williams believes that Phillips' presence was to intimidate her. ECF No. 40-3, PageID.533. Marini admits that Williams initially contacted Yeager to make her complaint; but claims she and Yeager met with Williams separately from Phillips; and she denies that Williams complained to her about Phillips other than to say he was inconsistent in how he treated employees. ECF No. 40-11, PageID.1062. Rick also denies that Williams ever reported any form of sexual harassment against Phillips. ECF No. 47-4, PageID.1463.

**B.     Allegations of Racial/Sexual Incidents**

In addition to the alleged sexual harassment by Phillips, Williams alleges that she was subjected to several racial and sexual incidents while she was employed at Mastronardi. Williams claims that Black employees were generally treated less

favorably, including being required to handle more moldy products than white employees. ECF No. 40-3, PageID.592. Mastronardi denies such treatment. Williams also reported to Human Resources ("HR") that Black employees were not called by their names. Specifically, she alleges that Galarza, her immediate supervisor, referred to her as "little Black girl," "girl," or "girl with the big butt." ECF No. 40-3, PageID.521, 531, 591; ECF No. 40-19, PageID.1187. There were also allegations that Galarza referenced her sister Diamond as a "ghetto Black bitch," and said things like "you don't have a butt or hips for a Black girl." ECF No. 40-3, PageID.601; ECF No. 40-19, PageID.1188-1189, 1191; ECF No. 40-12, PageID.1131. Galarza denies these claims. ECF No. 40-4, PageID.661; ECF No. 40-19, PageID.1188-1189.

Williams also alleges that inappropriate jokes and statements were made to her and in her presence. For example, Emberton, a production supervisor, asked a Peterson, "why are Black basketball players so tall?" and his response was because "they're knee grows" referencing "knee grows" as "negros." ECF No. 40-3, PageID.522. Emberton denies ever making such statements. ECF No. 40-19, PageID.1189. However, Peterson confirmed that it occurred but believed it to be a joke. ECF No. 47-2, PageID.1432; ECF No. 40-19, PageID.1188. Williams also alleges that Peterson said to her "what is Black but does not work," and his response was "decaf coffee" which he thought was funny because it could be racist and allow

6

him to "test if you're racist."  ECF No. 47-2, PageID.1452-1453; *see also* ECF No. 42, PageID.1275 (*referencing Ex. J, media uploaded file*).

Williams alleges that in another incident, Galarza, shift manager, asked Peterson if he had "ever had black p****y before?"  ECF No. 40-3, PageID.531; ECF No. 40-19, PageID.1187.  Williams alleges this was done in her presence, but Peterson denies that, admitting that Galarza did ask him that question but that it occurred 2 years prior, before Williams worked at Mastronardi.  ECF No. 47-2, PageID.1429; ECF No. 40-19, PageID.1188.  Another employee, Annie Thomas ("Thomas") stated that Peterson told her about the incident just a week prior.  ECF No. 40-19, PageID.1190.  Anthony Williams ("Anthony"), another employee, also stated that Galarza asked Peterson if "he's ever *eaten* black p****y?" and that the conversation occurred within the prior month to three months; however, he claims it was in the presence of himself and Diamond, and was unsure if anyone else heard it. ECF No. 40-12, PageID.1134; ECF No. 40-19, PageID.1191.  Galarza denies these allegations; but Peterson confirms that it happened and states that Galarza coached him on two occasions to tell HR that he didn't remember anything.  ECF No. 47-2, PageID.1429; ECF No. 40-4, PageID.656; ECF No. 40-19, PageID.1188-1189.

On August 22, 2023, Williams called Yeager to make a complaint about these incidents.[3]  ECF No. 40, PageID.466.  She also informed Yeager that Galarza pulled her from the line and told her that "[he was] tired of [her] eyeballing him" and that "[she had] a nasty attitude."  *Id.*  Over the next several days, Mastronardi commenced an investigation and interviewed over ten employees.  *Id.*  Williams denies that the investigation was complete, because HR failed to interview Richard Fulton, a former employee who had previously complained about Galarza's racist conduct.  ECF No. 42, PageID.1274.  On August 25, 2023, based on the interviews conducted, Mastronardi concluded that it could not substantiate Williams' allegations and informed her of the same.  ECF No. 40-19, PageID.1187; ECF No. 40-11, PageID.1084.

## C.    Mastronardi Attendance Policy

As a Grader, Williams was assigned to work on day shift, starting at 5:00 a.m. *See* ECF No. 40-3, PageID.515; ECF No. 40-10, PageID.961.  Graders at Mastronardi were subject to an "Hourly Operations Attendance Policy," which covers several company procedures at issue in this litigation.  *See* ECF No. 40,

---

[3] It is disputed whether Williams also informed Yeager about the allegations of Phillips' sexual harassment at that time.  *See supra*, p. 5.  There is another incident captured on video, where Felosak stated "I knew a Black girl could do it" referencing Diamond climbing through a small vent to unlock a door.  *See* ECF No. 43-10, PageID.1371; *see also* ECF No. 42, PageID.1275 (*referencing Ex. K, media uploaded file*).  However, nothing in the record supports that HR was ever made aware of this incident.

PageID.461; ECF No. 40-8, PageID.899.[4]  The attendance policy outlines specific

procedures for clocking in and out, requesting leave, use of personal time off, and

unexcused absences from work.[5]  *See generally* ECF No. 40-8.  An employee who

did not follow the policy was assigned attendance points in the following order:

- Employees are given a half point for (1) [failing] to clock in properly, for example, failing to punch out for unpaid breaks, (2) a missed punch, (3) clocking in early (more than 5 mins before the start of shift), (4) being late by less than one hour, and (5) leaving less than one hour early or taking extended breaks.

- Employees are given two points for (1) being absent from work without personal time available, (2) being more than an hour late for their shift, which includes instances where an employee has personal time available but did not follow the proper call-in procedure, and (3) leaving more than one hour early. Under this point violation, the policy states "Employees using a half day absence with personal time available and using the proper call off procedure are not subject to these points."

- Employees are given three points for violating the "No Call No Show" policy.[6]

- Employees will be given double points during holidays, peak times, blackout periods, and special events (all of which were to be communicated two weeks in advance via a posting on the time clocks).

---

[4] It should be noted that Williams denies that this policy applies to her, stating she was given a policy dated June of 2023, despite starting work in May of 2023.  ECF No. 12, PageID.1269. However, Williams does not provide the Court with the June 2023 policy.

[5] According to Yeager, "Mastronardi employees at the Livonia facility use a fingerprint scanner to clock in/clock out of their scheduled shift and breaks."  ECF No. 40-1, PageID.487.  The attendance policy states "[e]mployees must clock in at the scheduled time, but no sooner than five (5) minutes before their scheduled start time and clock out immediately at the end of the scheduled shift but no later than five (5) minutes after the shift ends."  *See* ECF No. 40-8, PageID.900.

[6] The "No Call No show" policy states: "Not reporting to work and not calling to report the absence is a no call/no show and is a serious matter.  The first occurrence of no call/no show will result in three (3) points.  Employees who have three (3) consecutive workdays of no call/no show will be considered to have abandoned their job."  *See* ECF No. 40-8, PageID.901.

*See* ECF No. 40, PageID.900. If an absence was not requested and approved in advance, it was considered an unplanned absence, which could later be excused if the employee followed the call-in procedure and had personal time to cover a half day or full day's absence. *Id.*

Williams denies that these point allocations applied to her because she states that Phillips allowed her to leave to get food without clocking out for breaks. ECF No. 40-3, PageID.536. Williams also alleges that despite there being call-in procedures, Phillips told her to contact him directly instead of calling in. *Id.* at PageID.511.

Employees could check their attendance point totals on the online portal. *See* ECF No. 40-8, PageID.901. Williams alleges she was unable to track her attendance points, and that she informed her supervisors and HR, but the problem was never rectified. *See* ECF No. 40-3, PageID.511, 526. Under the attendance policy, employees who "have reached or exceed 8 points maybe terminated from the company." *See* ECF No. 40-8, PageID.901.

In addition to the online portal, Yeager kept a weekly record of all employee's attendance points. ECF No. 40-1, PageID.488. Each week, she would send any point accumulations to shift managers for review to identify errors and/or make corrections. *Id.* If an employee had reached or exceeded 8 points, but the majority of the points came from missed punches on the fingerprint scanner, in lieu of

termination, Yeager would reduce the employee's points below 8 and direct the shift managers or supervisors, in their discretion, to issue a final attendance warning to the employee. *See id.* at PageID.488-489.[7]  If an employee worked all scheduled time for one calendar month without any additional attendance infractions, they would be entitled to have one (1) point deducted from their attendance points balance. *See* ECF No. 40-8, PageID.901.

### D.   Williams Attendance and Termination

Williams began receiving attendance violation points at the end of June 2023. *See* ECF No. 40-13, PageID.1172.  By August 3, 2023, Williams had garnered 9.5 points for tardies, missed punches and an unexcused absence in the attendance system. *Id.*  Williams disputes these allocations, as she alleges that after she rebuffed Phillips' advances to spend the night at his home, he notified her that she had earned 14 points, which was then taken down to 9 and then again to 7.5 points.  ECF No. 40-3, PageID.512.[8]  Mastronardi disputes this was the case, but does admit to

---

[7] The parties dispute whether Phillips, a supervisor over Galarza, Patino, Diamond, and Williams, also had access to make alterations in the point tracking system.  *Compare* ECF No. 40-5, PageID.763 *with* ECF No. 40-5, PageID.764-765.

[8] The Court notes that none of the attendance sheets provided in the record show that Williams ever accumulated 14 attendance points.  *See* ECF No. 40-13.  Despite having attendance points, Williams also alleges that Phillips gave her a perfect attendance bonus check.  ECF No. 40-3, PageID.517.  Phillips admits to hearing Williams received a bonus but denies any responsibility for it.  ECF No. 40-5, PageID.764.

reduction in points, as it did with other employees.  ECF No. 47, PageID.1412; ECF No. 40-10, PageID.952.

On August 10th, Yeager emailed Galarza and Phillips the list of employees who had accumulated attendance points, which included Williams.  *See* ECF No. 40-14, PageID.1174.  Galarza informed Yeager that Williams, as well as four others, had accumulated enough attendance points to be terminated, and he recommended terminating them all.  *Id.*  Then, on August 15th, Yeager emailed Galarza and Patino informing them most of Williams' attendance points were from missed punches, and based on that, the company would not normally terminate without giving a final warning.  ECF No. 40-15, PageID.1178.  Yeager, therefore, told them to issue Williams a final attendance warning, and stress the importance of clocking in and out.  *Id.*  On August 17th, after not getting a response, Yeager reminded Galarza and Patino to issue Williams' final attendance warning.  *Id.*  Galarza acknowledged he received Yeager's email but did not issue the final warning until a week later on August 23rd.  *Id.*; ECF No. 40-16, PageID.1180.

Prior to receiving the final attendance warning, on August 19th, Williams and Galarza had an exchange of words—to which the parties dispute what actually happened.  According to Mastronardi, Galarza observed Williams working "incorrectly and inefficiently" by only using one hand while inspecting the produce, rather than two.  *See* ECF No. 40, PageID.465 (citing ECF No. 40-4, PageID.651).

12

He confronted Williams and she asked, "what are you looking at?" prior to Galarza asking her to step off the line. *Id.* He told Williams that it seemed like she had an attitude, to which she responded that he was racist and did not like Black people. *Id.*

Williams denies this. She states that she was pulled from the line when Galarza, along with Patino, confronted her because Galarza said that Williams was "eyeballing him" and that she had a nasty attitude. *See* ECF No. 42, PageID.1274 (citing ECF No. 43-8, PageID.1344). She alleges that Galarza continued to yell at her, causing her head to hurt and she asked to go home. ECF No. 40-3, PageID.521, 527-528.[9] Following this incident, Galarza emailed HR to inform them what had occurred. ECF No. 40-18. In response, Yeager asked Galarza if they had ever issued Williams a final attendance warning to which he responded he had not. *Id.* at PageID.1184.

After the August 19th incident, Yeager spoke with Williams over the phone on August 22nd. *See* ECF No. 40-11, PageID.1062. During that conversation Yeager documented Williams' report that Galarza was allowing rotten product to be passed along, when according to Phillips, that was not the correct process. *See* ECF

---

[9] The parties are in dispute over whether Williams was given permission to leave or made the independent decision to leave on her own. *See* ECF No. 42, PageID.1274; ECF No. 40, PageID.466; ECF No. 40-18, PageID.1184. Mastronardi alleges that Galarza and Patino made the decision to place Williams on another line (which Williams alleges they had no authority to do), and instead of complying with the request, Williams left the facility. *Id.* The Court notes that no attendance points were given for Williams' departure that day. *See* ECF No. 40-13, PageID.1172.

No. 40-19, PageID.1187. Galarza confronted Williams about going to his superiors over his directions. *See* ECF No. 40-19, PageID.1188.

On August 22nd, Williams, Yeager, Marini, and Phillips had a conversation that led to a three-day internal investigation conducted by Yeager, Phillips, Marini, Kristin Candler, and Heather Suleiman. *See* ECF No. 40-10, PageID.989. [10] On August 23rd, Marini and Yeager, along with Phillips, interviewed Peterson, Galarza, Patino, and Emberton. On that same day, after his interview with HR, Galarza handed Williams her final attendance warning. *See* ECF No. 40-16, PageID.1180. The following day, Marini, Phillips, and Yeager interviewed Williams, Thomas, Jessa Langnau ("Langnau"), Felosak, and Diamond.[11] Thomas acknowledged that Galarza made inappropriate comments, while Langnau and Felosak denied any knowledge of these allegations. *See* ECF No. 40-19, PageID.1190.

On August 25th, Marini and Yeager interviewed two other employees – Anthony Williams and Emmanuel. *See* ECF No. 40-19, PageID.1191. Both confirmed that Galarza made inappropriate comments. *Id.*; *see supra* p. 7. Despite this, Yeager concluded that none of Williams' claims could be substantiated and

---

[10] The Court notes that the August 22nd conversation was also the conversation where Williams complained of the racial and sexual incidents she experienced, as well as Williams' claims of sexual harassment by Phillips (to which Mastronardi denies). This investigation appears to have been co-mingled with another incident concerning racial slurs towards Diamond. *See* ECF No. 40-19, PageID.1188; *see also* ECF No. 40-10, PageID.988-989.

[11] Yeager's notes of the interview with Diamond appear to address only the complaints Diamond made to HR and not any of Williams' allegations. *See* ECF No. 40-19, PageID.1190.

instead, reiterated to her that she was on her final attendance warning, mentioned that she was causing "work disruptions," and further discussed her attendance points with her. *See* ECF No. 40-19, PageID.1191. Yeager directed Williams to address any additional concerns to Phillips. *Id.* at PageID.1187.

About three weeks later, on September 16th, Williams arrived for her 5:00 a.m. shift at 7:58 a.m. ECF No. 40-20. She was assessed two points under the attendance policy, which took her over the 8-point termination mark. *Id.* The parties dispute whether this time was excused. Williams alleges that she called off work on this date which should have been excused as PTO because she had six available hours. ECF No. 42, PageID.1276.[12] Mastronardi assessed the attendance points and subsequently terminated Williams on September 19th. *See* ECF No. 40-21, PageID.1195.

### E.     The Instant Lawsuit

Williams commenced this action on December 31, 2023.[13] She alleged violations of 42 U.S.C. § 1981 and ELCRA. *See* ECF No. 1. On May 8, 2024, Williams filed another action in this district, based on identical facts, but alleging violations of Title VI. *See Williams v. Mastronardi Prod. Ltd.*, No. 2:24-cv-11228

---

[12] The Court notes that in the attendance records provided to the Court, Williams was credited four hours for personal time off and an additional nine work hours, including overtime, on September 16, 2023. *See* ECF No. 40-20, PageID.1193.

[13] The case was originally assigned to the Honorable Linda V. Parker, but reassigned to the undersigned in April, 2024. *See Administrative Order* 24-AO-007.

(E.D. Mich. May 8, 2024).  To identify the correct employer of Plaintiff and consolidate all claims into one lawsuit, the parties stipulated to consolidation and the filing of an Amended Complaint that named only Mastronardi Produce-USA, Inc. as the sole defendant.  ECF No. 21.  The Amended Complaint followed.  *See* ECF No. 22.  Now before the Court is Defendant's Motion for Summary Judgment.  *See* ECF No 40.  The Motion is fully briefed and the record before the Court is sufficient, such that oral argument is unnecessary to reach disposition.  *See* E.D. Mich. L.R. 7.1(f).

## II.

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In evaluating the motion, the Court must determine "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

"To survive summary judgment, the nonmoving party 'must present significant probative evidence' putting the material facts in doubt."  *Walden v. GE Int'l, Inc.*, 119 F.4th 1049, 1057 (6th Cir. 2024) (quoting *Green Genie, Inc. v. City of Detroit, Mich.*, 63 F.4th 521, 526 (6th Cir. 2023)).  The "facts must be viewed in

16

the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to survive a motion for summary judgment. *Anderson*, 477 U.S. at 252.

When evaluating discrimination and retaliation claims at summary judgment, which are based on indirect evidence, the Court applies the *McDonald Douglas* framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Redlin v. Gross Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606-07, 613 (6th Cir. 2019) (citations omitted); *Conti v. Am. Axle & Mfg., Inc.*, 326 F. App'x 900, 908 (6th Cir. 2009) ("ELCRA plaintiff also may rely on the indirect, burden-shifting approach sanctioned in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."). Under this framework, Williams must first establish a *prima facie* case of the claim. *See George v. Youngstown State Univ.*, 966 F.3d 446, 459 (6th Cir. 2020); *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). If the *prima facie* case is shown, the burden then shifts to Mastronardi to "articulate some legitimate, non-discriminatory or retaliatory reason for their actions." *George*, 966 F.3d at 459. If

17

satisfied, the burden then shifts back to Williams to show the articulated reason is pretextual. *Laster*, 746 F.3d at 730.

"Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion through the process." *Laster*, 746 F.3d at 730 (citing *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)). And the Court's duty is to "not allow 'this burden-shifting analysis to obfuscate the appropriate question—whether there exists a genuine issue of material fact.'" *See Jackson v. VHS Detroit Receiving Hops., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016) ("*VHS Detroit*") (citing *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011); *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000)).

## III.

Title VII, ELCRA and 42 U.S.C. § 1981 prohibit employers from discriminating or discharging an employee on the basis of race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e-2(a)-(c); MICH. COMP. LAWS § 37.2202(1)(a); 42 U.S.C. § 1981. Under this statutory scheme, Williams alleges nine counts which can be grouped into four categories: *Race Discrimination* (Counts I, II, and III), *Retaliation* (Counts IV, V, and VI), *Gender Discrimination/Sexual Harassment* (Counts VII and VIII), and *Hostile Work Environment* (Count IX). *See generally* ECF No. 22. Mastronardi moves for summary judgment on three grounds: (1) Williams' retaliation claims under Title VII and ELCRA fail as a matter of law;

18

(2) Williams cannot establish a *prima facie* case for race discrimination; and (3) Williams cannot establish a claim for hostile work environment based on race or sex.[14]  *See* ECF No. 40.

The Court will analyze Defendant's Motion under each theory of liability.

## A.    RACE DISCRIMINATION (COUNTS I, II and III)

Under Counts I, II, and III, Williams alleges her race was the catalysis for Mastronardi's acts of discrimination in violation of 42 U.S.C. § 1981, Title VII, and ELCRA.  *See* ECF No. 22, PageID.140, 142-146.  Mastronardi moves for summary judgment on all these counts arguing that Williams fails to establish a *prima facie* case of discrimination under any of these statutes.  ECF No. 40, PageID.474-476. Racial discrimination claims under § 1981, ELCRA, and Title VII are reviewed under the same standard.[15]  *See Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771-72 (6th Cir. 2018); *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999).

---

[14] Mastronardi combines its analysis for summary judgment on Williams' sexual harassment claims under Title VII and the ELCRA (Counts VII and VIII) with the separate claim for hostile work environment based on sex (Count IX), arguing that there is no standalone sexual harassment claim without hostile work environment.  *See* ECF No. 40, PageID.480, n.3 (citing *Thomas v Henderson*, 44 F. Supp. 2d 915, 924 (E.D. Mich. 1999)).  The Court agrees and will address that aspect of the claims together.  However, the Court notes, as will be discussed *infra*, III.C., that Counts VII and VIII also allege gender discrimination claims, which Mastronardi does not address in its motion.  *See* ECF No. 22, PageID.151-154.

[15] The Courts notes one slight difference, that for a claim of race discrimination under ELCRA, Williams must prove "but for causation or causation in fact."  *See Minner v. Gen. Motors, LLC*, No. 363462, 2024 WL 2868657, at *5 (Mich. Ct. App. June 6, 2024) (citing *Hecht v. Nat'l Heritage Acads., Inc.*, 886 N.W.2d 135, 146 (Mich. 2016)).  However, this element is not dispositive of the issue before the Court.

To establish a *prima facie* case of racial discrimination, Williams must prove that (1) she was a member of a protected class, (2) was qualified for the job and performed it satisfactorily, (3) she suffered an adverse employment action despite her qualifications and performance, and (4) she was replaced by someone outside the protected class or treated differently than a similarly situated, non-protected employee. *Laster*, 746 F.3d at 727.

Mastronardi asserts that Williams' *prima facie* case fails because she has not identified "a similarly situated, non-protected employee" entitling it to summary judgment on these claims. *See* ECF No. 40, PageID.474-476. The Court agrees.[16] Williams argues that co-worker, Billy Peterson, qualifies as "a similarly situated, non-protected employee" because (1) "[he] was accused by multiple coworkers of recording Black men in the restroom, (2) was not disciplined and (3) retained his employment." *See* ECF No. 42, PageID.1283. While the record is unclear as to the veracity of Peterson's actions, the Court finds that use of him as a comparator is like comparing apples to oranges. Even assuming Peterson committed a violation that could have warranted termination, his attendance points were not at issue, he made

---

[16] Neither side contests whether the first three requirements have been satisfied. *See*, *e.g.*, ECF No. 42, PageID.1283 ("As an African American employee, she belongs to a protected class. She was qualified for her role and performed it satisfactorily until the point of termination. She was fired under the disputed circumstances"). There is also no allegation that Williams was replaced by someone outside the protected class. The Court therefore focuses its analysis only on requirement four – a similarly situated, non-protected employee.

no claims of discrimination, and Williams fails to provide the Court with any sufficient evidence to support that she and Peterson were similarly situated.

Workplace violations are not viewed from a singular lens. *See, e.g., Davis v. Southfield Pub. Sch. Dist.*, No. 2:07-cv-13559, 2008 WL 5188265, at *6 (E.D. Mich. Dec. 8, 2008) (citations omitted). As noted by Williams, in order to be a comparator, conduct must be similar in kind and severity and of comparable seriousness. *See Bobo v. United Parcel Serv.*, 665 F.3d 741 (6th Cir. 2012), *Wright v. Murray Guard, Inc.*, 455 F.3d 702 (6th Cir. 2006). That is simply not present here. Allegations of secretly recording people in the restroom and failing to follow attendance policies are neither similar in kind, severity, or of comparable seriousness.

The Sixth Circuit has established three factors, known as the *Mitchell* factors, to aid in determining whether employees are "similarly situated" on allegations of differential disciplinary action:

> … [T]he individuals with whom the plaintiff seeks to compare his/her treatment must have (1) dealt with the same supervisor, (2) have been subject to the same standards and (3) have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*See VHS Detroit*, 814 F.3d at 777 (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). The weight given to each varies case by case. *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003). Here, the record is void of evidence that Williams and Peterson reported to the same supervisor; but it is established that they

21

were both subject to the same standards as they were both Graders. *See* ECF No. 47-2, PageID.1425. But the Court gives the most weight to factor three. Williams presents no evidence that a reasonable jury could find that she and Peterson engaged in the same conduct. Therefore, Peterson is not a similarly situated, non-protected employee, as required to make a *prima facie* case of discrimination.

Consequently, Williams has not met her burden of proving a *prima facie* case for race discrimination. The Court, therefore, grants summary judgment in favor of Mastronardi on Counts I, II and III.

## B.    RETALIATION (COUNTS IV, V and VI)

Mastronardi moves for summary judgment on Williams' retaliation claims (Counts IV, V, and VI) because it argues that its decision issue Williams a final attendance warning occurred prior to her complaints to HR; that the temporal proximity of her termination to the complaint to HR, alone, is not enough to support her claim; and that Williams fails to provide any evidence that her termination for attendance was pretext. ECF No. 40, PageID.470-473. Williams asserts that the final warning was not communicated to her until after she made complaints of racial discrimination and sexual harassment; that the temporal proximity of her complaints to HR and her termination are accompanied by record evidence to support causation; and Mastronardi's claims that she was solely terminated based on attendance points is pretext. ECF No. 42, PageID.1280-1283. After a review of the record, the Court

finds a genuine issue of material fact exists such that Counts IV, V, and VI must proceed to a jury for a factual determination.

Title VII and ELCRA retaliation claims are analyzed under the same standard. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018). To make a *prima facie* showing of retaliation, plaintiff must show "(1) [she] . . . engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." *Laughlin v. City of Cleveland*, 633 F. App'x 312, 315 (6th Cir. 2015) (citing *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008)); *see also El-Khalil v. Oakwood Healthcare, Inc.*, 934 N.W.2d 665, 670-71 (Mich. 2019) (per curiam). Plaintiff's burden is "not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Retaliation claims follow the *McDonnell-Douglas* framework. After Williams establishes a *prima facie* case, the burden of production shifts to Mastronardi to "articulate some legitimate, non-discriminatory or retaliatory reason for their actions." *George*, 966 F.3d at 459. If satisfied, the burden then shifts back to Williams to show that the articulated reason is pretextual. *Laster*, 746 F.3d at 730.

Looking to the *prima facie* case. It is undisputed that Williams engaged in a protected activity and Mastronardi was aware of it. *See* ECF No. 40, PageID.466;

23

ECF No. 40-19, PageID.1187.[17]  The parties also agree Williams was subject to an adverse employment action when she was terminated less than three weeks after making her complaint.  *See* ECF No. 40, PageID.471-473, 475; ECF No. 42, PageID.1281.  So, the question before the Court concerns the fourth element: whether there is a casual connection between the protected activity and the adverse action.

### 1.   *Causation*

At the summary judgment stage, the burden of showing causation is minimal, requiring "'some evidence to deduce a causal connection' between the adverse action and the protected activity."  *See Gray v. State Farm Mut. Auto. Ins. Co.*, 159 F.4th 1024, 1033 (6th Cir. 2025) (citing *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009); *A.C. ex rel J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 699 (6th Cir. 2013)).  If the adverse action happens right after the protected activity, a plaintiff "may be able to rely on temporal proximity alone to overcome a motion for summary judgment."  *Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568, 588 (6th Cir. 2022) (citation omitted).  But if "some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the

---

[17] The Court notes that the parties dispute whether Williams reported Phillips' alleged sexual harassment; however, Mastronardi acknowledges that Williams made a complaint to HR about the alleged racial discrimination and that is enough to establish the first two elements of a retaliation claim.

employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* (quotation marks and citation omitted).

Mastronardi alleges that Williams fails to meet the causation element because it made the decision to issue a final attendance warning, prior to Williams' complaints to HR.  ECF No. 40, PageID.470-471.  As a threshold matter, the Court finds this argument fails because the causal connection must be between the protected activity and the adverse employment action.  This argument assumes that the adverse employment action was the issuance of the final attendance warning. But as a matter of law, that alone does not amount to an adverse employment action, without some other consequence.  *See Mitera v. Ace Controls, Inc.*, No. 20-13327, 2022 WL 1913603, at *4 (E.D. Mich. June 3, 2022) (citing *Taylor v. Geithner*, 703 F.3d 328, 338 (6th Cir. 2013)); *see also Sanchez v. Brennan*, No. 1:19-CV-02133, 2021 WL 1634572, at *3 (N.D. Ohio Apr. 27, 2021).

Williams argues that "an adverse employment action under Title VII occurs not when it is internally discussed, but when it is communicated and implemented." ECF No. 42, PageID.1280 (citing *Delaware College v Ricks*, 449 U.S. 250, 258 (1980)).  This supports a finding that the adverse employment action here was not issuance of the final attendance warning, but instead was Williams' termination, which was the consequence and implementation of the warning.  *Id.*  Looking at Williams' termination as the true adverse action, the Court notes that it occurred *after*

she made her complaints to HR, not prior.  Therefore, the Court analyzes whether there are any disputed facts as to her termination because of her complaints to HR.[18]

It is undisputed that Williams was terminated less than a month after making complaints to HR.  *See* ECF No. 40, PageID.466, 469.  Mastronardi however argues that the temporal proximity of her termination is not enough to establish causation because Williams' attendance point violation (for reporting to work late) two days before her termination disrupted the causal chain between the time that she made her report to HR and her ultimate termination.  ECF No. 40, PageID.471-472; ECF No. 47, PageID.1415.  Mastronardi relies on *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612 (6th Cir. 2013), but there the Sixth Circuit affirmed a grant of summary judgment because of a lack of evidentiary support to establish a causal connection.  *Id.* at 628.

Here, Williams argues that while temporal proximity, alone, may not be enough to establish causation, she presents additional evidence that provides an inference of causation – namely that Mastronardi exhibited retaliatory behavior immediately following her complaints by reassigning her to a colder production line,

---

[18] The Court notes that Mastronardi seems to concede this point, by first arguing that the decision to issue the final attendance warning prior to Williams' complaints renders the retaliation claim invalid as a matter of law; but then goes on to argue that the temporal proximity between Williams' complaints and her termination are not enough to establish causation and that there is no evidence that Plaintiff's termination was pretext.  *See* ECF No. 40, PageID.471-472; see also ECF No. 42, PageID.1415.  Nonetheless, even if the Court were to look to the timing of the final attendance warning, and not the termination, the Court finds that the fact that the attendance warning was not communicated to Williams until after she made her complaints to HR, would render the same result.  *See* ECF No. 40-16, PageID.1180 (Galarza gave Williams her final attendance warning after he was interviewed by HR because of her complaints).

falsely accusing her of walking off the job, denying her access to her attendance records; and that the Mastronardi's attendance claims don't add up because they were based on missed punches which Yeager agreed were not grounds for points and Williams received a attendance bonus which would require less than three attendance points. ECF No. 42, PageID.1281-1282.

At this stage, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587. In doing so, the Court finds that Williams presents enough evidence, in addition to the temporal proximity of the termination, to submit the question of causation to a jury. As noted, the establishment of a *prima facie* case is a very low burden, and Williams has presented sufficient evidence to clear this low bar. *Nguyen*, 229 F.3d at 563.

### 2. *Pretext*

Following the *McDonnell-Douglas* framework, the burden of production then shifts to Mastronardi to "articulate some legitimate, non-discriminatory or retaliatory reason for their actions." *George*, 966 F.3d at 459. If satisfied, the burden then shifts back to Williams to show the articulated reason is pretextual. *Laster*, 746 F.3d at 730. Here, Mastronardi's legitimate non-discriminatory reason for their decision to terminate Williams' employment was due to her attendance violations. *See* ECF No. 40, PageID.471. This is sufficient to satisfy Mastronardi's burden so the Court will now turn to pretext.

27

Mastronardi's final argument is that Williams cannot show on this record that its proffered reason of attendance violations was pretextual. ECF No. 40, PageID.472-473; ECF No. 47, PageID.1416. The Court disagrees and finds that there is enough evidence to create a genuine issue of material fact with respect to this prong.

Pretext is a "commonsense inquiry" that asks: "did the employer fire the employee for the stated reason or not?" *See Jackson v. Genesee Cnty. Rd. Comm'n,* 999 F.3d 333, 351 (6th Cir. 2021). A plaintiff can show pretext in one of three "interrelated ways: (1) that the proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate the employer's actions, or (3) that the proffered reason was insufficient to motivate the employer's action." *Id.* at 350-51 (cleaned up). This burden is "not heavy," and summary judgment will be appropriate only if "no reasonable juror could conclude that the employer's offered reason was pretextual." *Jackson,* 999 F.3d at 351. Thus, if the evidence has "two reasonable interpretations," the Court "must allow the jury to resolve the issue" of whether Williams' cited evidence is enough to conclude that Mastronardi retaliated against her for engaging in protected activity. *Id.* (quotation marks and citation omitted). And any evidence or inference "that properly can be drawn from the evidence present during the plaintiff's prima facie case" may also "be considered in

28

determining whether the defendant's explanation is pretextual." *Ondrick v. MGM Grand Detroit, LLC*, 698 F.3d 642, 654 (6th Cir. 2012).

Here, the evidence and inference drawn from establishing a *prima facie* case for retaliation is enough to also establish that the proffered reason was insufficient to justify Mastronardi's actions. *See* ECF No. 40, PageID.472. Williams alleges that not only was the timing of her termination just after reporting racial discrimination and sexual harassment, but that Mastronardi's haphazardly calculated attendance points, which refutes the legitimate non-discriminatory reason as pretext. *See* ECF No. 42, PageID.1282.

For example, after the August 19th incident, in which the parties dispute whether Williams walked off the job or was granted permission to leave, no attendance points were issued to Williams for leaving that day. *See* ECF No. 40-13, PageID.1172. Based on the Hourly Operations Attendance Policy, there should have been an attendance violation on her attendance point log; yet nothing is mentioned or documented. *Compare* ECF No. 40-8, PageID.900 *with* ECF No. 40-13, PageID.1172. Additionally, despite Mastronardi's claims that Williams was in violation of the attendance policy, she received a "perfect attendance bonus" which required her to have less than 3 attendance points. As argued by Williams, this would directly conflict with Mastronardi's attendance policy; and "an employer's failure to follow a policy that is relevant to termination or demotion can constitute relevant

29

evidence of pretext." *See DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 394 (6th Cir. 2005).

Similarly, there is the fact that on September 16th, the day that Williams allegedly reported to work three hours late, her time sheet reflected that she was given credit for four hours of personal time off and nine hours of work time, including overtime. *See* ECF No. 40-20, PageID.1193. While there may be a reasonable explanation for this, that is a question for the jury to resolve, not the Court. Because errors by an employer that are "too obvious to be unintentional" call a legitimate non-discriminatory reason into doubt, a reasonable jury could find that the employer's proffered non-discriminatory reason was pretextual. *See Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).

The Court finds that there is enough dispute as to the facts surrounding the reason for Williams' termination in order to present it to a jury. Accordingly, the Court denies summary judgment on Counts IV, V and VI.

## C. GENDER/SEXUAL HARASSMENT DISCRIMINATION (COUNTS VII AND VIII)

Gender based (or sexual) discrimination and sexual harassment are two different legal claims. Sexual discrimination is unfair treatment based on sex or gender that leads to an adverse employment action. Sexual harassment, on the other hand, is a form of gender discrimination but focuses on unwelcomed behavior of a sexual nature that creates a hostile or offensive work environment. Williams'

Amended Complaint appears to allege both gender discrimination and sexual harassment, in the alternative, under Title VII (Count VII) and ELCRA (Count VIII). *Compare* ECF No. 22, PageID.151 ("[Mastronardi]'s conduct, as alleged herein, violated Title VII, which makes it unlawful to sexually harass *or* discriminate against an employee on the basis of gender.") *with* PageID.153 ("[Mastronardi]'s conduct, as alleged herein, violated ELCRA, which makes it unlawful to sexually harass *or* discriminate against an employee.") (emphasis added).

Mastronardi's Motion for Summary Judgment appears to only address the sexual harassment claims.  *See* ECF No. 40, PageID.480 n.3.  In a footnote, Mastronardi acknowledges the existence of Counts VII and VIII, but argues they did not need to address the merits of either count because, under *Thomas v. Henderson*, 44 F. Supp. 2d 915, 924 (E.D. Mich. 1999), "sexual harassment only exist under the umbrella of the creation of a hostile work environment . . . [and there] is no standalone sexual harassment claim without hostile work environment."  ECF No. 40, PageID.480 n.3.  The Court agrees with that assessment to an extent.  Sexual harassment claims can exist in the context of a hostile work environment but can also exists in the form of *quid pro quo* harassment.  *Thomas*, 44 F. Supp. 2d at 924.

However, sexual (or gender based) discrimination is a different legal concept, which Mastronardi failed to address.  *See* ECF No. 40, PageID.480-483; *see also Kalich v. AT&T Mobility, LLC,* 679 F.3d 464, 472 (6th Cir. 2012) (citing *Haynie v.*

31

*Mich.*, 644 N.W.2d 129, 135 (Mich. 2003)) ("Discriminatory conduct that is gender-based but not sexual in nature does not constitute sexual harassment."); *Lavack v. Owen's World Wide Enter Network, Inc.*, 409 F. Supp. 2d 848, 854 (E.D. Mich. 2005) (citing *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 520 (6th Cir. 2001)) ("The Sixth Circuit strongly stresses that there is a considerable distinction between sexual harassment and an actionable Title VII gender discrimination claim").[19]

To the extent that Counts VII and VIII bring gender discrimination claims, those claims survive summary judgment as Mastronardi did not move for summary judgment under that legal theory. However, to the extent that Counts VII and VIII are sexual harassment-based, summary judgment is also denied consistent with the Court's analysis of Williams' hostile work environment claim based on sex (Count IX), as is described below. *See infra*, III.D.

---

[19] For context, to prove a *prima facie* case of gender discrimination, Williams must show: (1) she is a woman, (2) she suffered an adverse employment action, (3) she was qualified for the employment position, and (4) she was treated less favorably than similarly situated male employee or was replaced by a male employee. *Haynes v. Clariant Plastics & Coatings USA, Inc.*, 144 F.4th 850, 858 (6th Cir. 2025) (citing *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014)). Whereas to prove a sexual harassment claim, Williams must show: (1) that she was a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and (5) that there is a basis for employer liability. *Meadows v. Wahler Auto. Sys., Inc.*, 45 F. Supp. 3d 645, 655 (E.D. Mich. 2014).

## D.   HOSTILE WORK ENVIRONMENT (COUNT IX)

Finally, Mastronardi seeks summary judgment on Count IX, Williams' claim for hostile work environment based on race and sex pursuant to ELCRA. *See* ECF No. 40, PageID.476, PageID.480. To succeed on a hostile work environment claim, Williams must establish: (1) she was a member of a protected class; (2) she was subject to unwelcome discriminatory harassment; (3) the harassment was based on her sex, race or national origin; (4) the harassment had the effect of unreasonably interfering with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability. *See Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017); *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999); *Quinto v. Cross & Peters Co.*, 547 N.W.2d 314, 319-20 (Mich. 1996). Because Williams' allegations of a hostile work environment overlap between race and sex and she brings them in one count, the Court will analyze them together since the legal elements are substantially similar. *Compare Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482 (6th Cir. 2020) (elements of ELCRA hostile work environment claim based on race) *with Kalich v. AT&T Mobility, LLC,* 679 F.3d 464, 470 (6th Cir. 2012) (elements of ELCRA hostile work environment claim based on sexual harassment).

To determine whether a hostile work environment exists, a court must consider the totality of the circumstances rather than examining specific incidents or

33

classes of incidents in isolation. *Williams v. General Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999); *Scotland v. DTE Energy Corp. Servs, LLC*, No. 369512, 2025 WL 3768113, at \*7-8 (Mich. Ct. App. Dec. 30, 2025) (citing *Ladd v. Grand Trunk Western R.*, 552 F.3d 495, 500 (6th Cir. 2009); *Chambers v. Trettco, Inc.*, 614 N.W.2d 910 (Mich. 2000)). The "conduct in question must be judged by both an objective and a subjective standard: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *See Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008) (internal citations omitted).

Mastronardi argues that Williams cannot establish a hostile work environment based on race because (i) there is no evidence to substantiate Williams experienced any racially-motivated comments; and (ii) even if there were, any race-based harassment was not severe or pervasive. ECF No. 40, PageID.478-480. Mastronardi similarly argues that (i) Williams was not subject to unwelcomed sexual harassment; (ii) even if she was, any alleged sexual harassment was not sufficiently sever or pervasive; and (iii) Mastronardi was not on notice of the harassment because Williams never reported Phillips' actions. *See* ECF No. 40, PageID.480-483.

In response, Williams argues that there is sufficient evidence to find that Williams was subject to both racially and sexually harassing incidents, including degrading and offensive comments, racist jokes, and unrelenting sexual harassment

34

by a superior.  ECF No. 42, PageID.1284-1287.  She asserts that Mastronardi's arguments rest on disputed facts which prevent summary judgment in its favor.  *Id.*  The Court agrees.

### 1.  *Evidence of Race-Based and Sexual Harassment*

The essence of Mastronardi's argument is that Williams' alleged race-based comments are unsupported by the record evidence.  ECF No. 47, PageID.1417.  But the Court finds just the opposite from a review of Mastronardi's internal investigation alone.  First, Williams alleges that Galarza constantly called her "little Black girl," "girl," or "girl with the big butt," and she claims that Annie Thomas and Jessa Langnau were witnesses to this conduct.  However, a review of the notes from the HR investigation suggests that Annie was not asked that question directly (like other employees were) as there is nothing addressing those specific statements as there was with others.  *Contrast* ECF No. 40-19, PageID.1190 (Annie Thomas notes) *with* ECF No. 40-19, PageID.1190 (Rick Patino notes).  Additionally, Annie reported that she was "cool with Johnny" which a reasonable jury could find to have bearing on her credibility.  *Id.* at PageID.1190.  And at the summary judgment stage, questions of credibility are best left for the jury to determine, not the Court.  *Marotta v. Ford Motor Co.*, 119 F. Supp. 3d 676, 692 (E.D. Mich. 2015); *Ondrick*, 698 F.3d at 648 (quoting *Anderson*, 477 U.S. at 255).

There were also allegations that Galarza referenced her sister Diamond as a "ghetto Black bitch," and said things like "you don't have a butt or hips for a Black girl."  ECF No. 40-3, PageID.601; ECF No. 40-19, PageID.1188-1189, 1191; ECF No. 40-12, PageID.1131.  While Galarza denies these claims, Anthony Williams substantiates that he has heard Galarza say that Diamond "doesn't have a butt for a black girl."  *Contrast* ECF No. 40-19, PageID.1188 (Johnny Galarza notes) *with* ECF No. 40-19, PageID.1188 (Anthony Williams notes).

The racist basketball joke allegedly told by Emberton to Peterson is also substantiated by the record evidence.  It is true that Emberton denies ever making the joke, but Peterson reported that Emberton did say it to him.  *Contrast* ECF No. 40-19, PageID.1189 (Jeff Emberton notes) *with* ECF No. 40-19, PageID.1188 (Billy Peterson notes).  And the fact that when confronted with the joke during his interview, Peterson "stared blankly and said he didn't know what [they] were talking about," could lead a reasonable jury to question his credibility.  Further, Mastronardi alleges that Peterson admitted to the joke being told long before Williams worked there – but if that were true, then how would she even know about the joke?  The Court finds that this is a question best left for a jury to determine.

Peterson also admits that he told Williams the decaf coffee joke, which by his own accounts he thought was funny because it could be racist and allow him to "test

36

if [someone was] racist." And Williams provided audio evidence of Peterson saying that joke. *See* ECF No. 42, PageID.1275 (*referencing Ex. J, media uploaded file*).

But most egregiously, there is the incident in which Galarza is alleged to have asked Peterson if he had "ever had black p****y before?" or "ever eaten black p****y before?" Williams alleges this was done in her presence, but Peterson denies that, admitting that Galarza did ask him the question but that it occurred two years prior, before Williams worked at Mastronardi. Again, if that was the case, how would she know about it? Moreover, why would other employees – Annie Thomas and Anthony Williams – state that they heard about the incident within the week or months prior to the investigation? *See* ECF No. 40-19, PageID.1190-1191; ECF No. 40-12, PageID.1134. Also, why would Galarza need to coach Peterson to tell HR he didn't remember anything, if this incident was not done in the presence of Williams? *See* ECF No. 47-2, PageID.1429; ECF No. 40-19, PageID.1188-1189. The Court finds that these are all questions that raise a genuine dispute of material fact and are best left to a jury to determine at trial.

Finally, Williams also alleges that she suffered continued sexual harassment by the highest-ranking manager on site through text messages and sexual overtures. Mastronardi asserts that the record evidence suggest otherwise – arguing that the reality of the situation is that Williams and Phillips "were pursuing each other prior to [her] employment after they were introduced by [her] sister and it continued while

37

[she] was employed." ECF No. 40, PageID.481. A reasonable jury could certainly find this to be inappropriate, but the record evidence also presents a genuine dispute as to whether Phillips' conduct was unwelcome and harassing.

Several text messages themselves could lead a reasonable jury to find that Williams rebuffed Phillips' overtures. For example, in a June 8, 2023 message (which was after Williams began working at Mastronardi), Phillips states, "So you ready to be mine" to which Williams responds "Nooooooooo" and Phillips sends angry emojis and images of characters destroying things. ECF No. 40-7, PageID.888. Another message, Phillips tells Williams' sister Diamond that "She don't mess with me frfr," and "She mean and she act like she don't like me," "I really wanna talk to her," and "She just pissed me off." His last text said "I'm done" with a photo of Jack Nicholson's character (who tried to kill his wife and son) from the movie The Shining. ECF No. 43-1, PageID.1293. Another example includes a text message in which Phillips says to Williams, "You f*ckin with me or not?" followed by "I'm serious" and Williams replies with an unamused emoji. *Id.* at PageID.1311-1312. The record also indicates that there was at least one occasion when Williams took Phillips to his home after work and was invited in. The parties dispute whether Phillips invited Williams to stay the night. But Williams asserts that she was "just trying to do whatever [she] could to keep [her] job[.]" *See* ECF No. 40-3, PageID.524.

The Court finds that the text messages, the visit to Phillips' home, the throwing of things when Williams rebuffed his advances, coupled with Phillips admitting that he was romantically interested in Williams (*see* ECF No. 40-5, PageID.748) is enough to create a genuine dispute of fact as to whether Phillips' conduct was sexually harassing.

## 2. *Severe and Pervasive*

Mastronardi alleges that even if racial incidents and sexual harassment did occur, those instances were not severe or pervasive enough to be actionable. ECF No. 40, PageID.478-480, 482. The Court evaluates severity and pervasiveness not by looking at each event in isolation but instead by considering the "totality of the circumstances." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006). In determining whether Williams meets her burden, the Court considers both an objective and a subjective perspective. *Schlosser*, 113 F.4th at 687; *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 568 (6th Cir. 2021) (citation omitted). The objective prong requires conduct that is "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive . . . ." *Wyatt v. Nissan North America, Inc.*, 999 F.3d 400, 411 (6th Cir. 2021) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993), 510 U.S. at 21 (internal quotation marks omitted)). The other prong requires

39

the victim to "subjectively perceive the environment to be abusive . . . ." *Williams*, 187 F.3d at 566.

There is no dispute that Williams subjectively believed her environment to be abusive. Mastronardi concedes that, at a minimum, she reported racial incidents that affected her at work. As to the sexual advances, Williams claims to have reported it to Yeager; and Williams testified that, when it came to Phillips' advances, she was "just trying to do whatever [she] could to keep [her] job." *See* ECF No. 40-3, PageID.524. She states that Phillips' continued advances were unwanted and harassing. The Court believes this to be enough to meet the subjective prong of the analysis or raise a disputed fact for a jury to determine.

Objectively, the Court finds that it is best left to a jury to determine if the alleged racial and sexual harassment was severe and pervasive. Whether conduct is severe or pervasive depends on "whether it is physically threatening or humiliating, or a mere offensive utterance," and "whether it unreasonably interferes with an employee's work performance." *Wyatt*, 999 F.3d at 411 (quoting *Harris*, 510 U.S. at 23) (internal quotation marks omitted). The Sixth Circuit has previously found that a supervisor's constant harassment over a four-month period which included unwanted sexual advances and sexual comments infused with racial references was enough to present the issue to a jury to determine the severity of the conduct. *See Johnson v. Ford Motor Co.*, 13 F.4th 493, 506 (6th Cir. 2021).

40

Here, Williams was similarly at Mastronardi for four months.  She alleges that her most senior supervisor was constantly making sexual advances towards her, texting her, propositioning her, and communicating to others that he wanted to have a relationship with her.  Williams also alleges that in that same four-month period she was subjected to racial jokes, she and another black woman were called derogatory racial slurs, and her direct supervisor asked a highly offensive sexual and racial derogatory question directed to a co-worker, but purposely in her presence.  A reasonable juror could most certainly find these comments more than "mere offensive utterances" but "physically humiliating."  *Harris*, 510 U.S. at 23.  And as the *Johnson* Court found, "these comments and messages go beyond simply teasing, offhand comments, and isolated incidents."  13 F.4th at 507.

The Sixth Circuit cautions lower courts not to "disaggregate[] the claims of a plaintiff alleging a hostile work environment… [because] it robs the incidents of their cumulative effect, and of course, when the complaints are broken into their theoretical component parts, each claim is more easily dismissed."  *Jackson v. Quanex Corp.*, 191 F.3d 647, 660 (6th Cir. 1999).  When looking at the totality of the circumstances and given the overlap between the sexual and racial nature of the alleged harassing environment, the Court finds that a reasonable person could determine Williams was subject to a work environment at Mastronardi that was

hostile and abusive. This, therefore, precludes summary judgment on the hostile work environment claims.

### 3. *Knowledge – Respondent Superior*

Finally, for a hostile work environment claim against an employer (based on the conduct of an employee) to survive a motion for summary judgment, a plaintiff must show that the defendant knew or should have known about the harassment and failed to act. *Jackson,* 191 F.3d at 659. It is undisputed that Mastronardi was aware of Williams' alleged racial based claims. However, Mastronardi argues that it was never made aware of the allegations of Phillips' sexual harassment. ECF No. 40, PageID.483. Williams disputes this saying that complaints about Phillips' conduct were told to Yeager. ECF No. 40-3, PageID.523, 525. However, Yeager denies the same. ECF No. 47-3, PageID.1460. When Marini was asked if Williams ever complained about Phillips, she said that as best she could remember, Williams complained that Phillips was inconsistent in how he treated people. ECF No. 40-11, PageID.10. The Court finds these facts seemingly inconsistent.

On one hand, one HR representative (Yeager) stated that Williams never reported anything about Phillips, either in person or via telephone. Yet, on the other hand, the other HR representative (Marini) reported that, in the meeting *with* Yeager, Williams made a complaint about Phillips, but it related generally to how he treated people. Given that all three offer conflicting accounts, it is up to a jury to determine

42

who they believe.  If the Court were simply to take the word of every employer that "it didn't know," no plaintiff would ever have the opportunity to present this issue to a jury.  Questions of credibility and who to believe are those of the jury, and not the Court at the summary judgment phase.  *Marotta*, 119 F. Supp. at 692; *Ondrick*, 698 F.3d at 648.

Viewing the facts in the light most favorable to the plaintiff, the Court finds a genuine dispute as to material facts on Williams' hostile work environment claim, and therefore summary judgment is not proper.[20]

### IV.

For these reasons, Mastronardi's Motion for Summary Judgment (ECF No. 40) is **GRANTED IN PART** and **DENIED IN PART**.  Williams has failed to establish a *prima facie* case for racial discrimination, and therefore summary judgment is **GRANTED** as to Counts I, II, and III.  However, because Williams establishes genuine issues of material fact on the retaliation and hostile work environment claims, summary judgment is **DENIED** as to Counts IV, V, VI, and IX.  Finally, because Mastronardi failed to raise or address the gender-based discrimination claims in Counts VII and VIII, summary judgment is **DENIED** as to

---

[20] The Court notes that Williams also argues that Phillips' actions constituted *quid pro quo* sexual harassment.  ECF No. 42, PageID.1286.  Having found that a genuine dispute of material fact exists as to the sexual hostile work environment claim, the Court need not reach a determination on the *quid pro quo* allegations.

those counts on that ground and also **DENIED** on sexual harassment grounds because a genuine issue of material facts exists as to the alleged sexual harassment.

Consequently, **IT IS HEREBY ORDERED** that Counts I, II, and III of the Amended Complaint (ECF No. 22) are **DISMISSED WITH PREJUDICE**. The case will proceed on Counts IV (Title VII Retaliation), Count V (ELCRA Gender/Sexual Harassment Based Retaliation), Count VI (ELCRA Race Based Retaliation), Counts VII (Title VII Gender/Sexual Harassment Discrimination), Count VIII (ELCRA Gender/Sexual Harassment Discrimination), and Count IX (ELCRA Hostile Work Environment).

**IT IS SO ORDERED.**

Dated: February 27, 2026
    Detroit, Michigan

s/Brandy R. McMillion
HON. BRANDY R. MCMILLION
United States District Judge

44